Case: 1:25-mc-00177
Assigned To : McFadden, Trevor N.
Assign. Date : 12/10/2025
Description: Civ. Misc.

UNITED STATES DIST
FOR THE DISTRICT O

| | |
|---|---|
| IN RE: FTC CIVIL INVESTIGATIVE DEMAND ISSUED TO GOOGLE LLC | **UNDER SEAL PURSUANT TO 15 U.S.C. § 57b-2a(e)(2)**<br><br>Misc. No.________________ |

**FEDERAL TRADE COMMISSION'S *EX PARTE* APPLICATION FOR AN ORDER PROHIBITING DISCLOSURE OF COMPULSORY PROCESS PURSUANT TO 15 U.S.C. § 57b-2a(c)**

The Federal Trade Commission ("FTC") applies *ex parte* to this Court pursuant to Section 21A of the FTC Act, 15 U.S.C. § 57b-2a(c), for an order prohibiting Google LLC, a third-party recipient of a Civil Investigative Demands ("CID") issued by the FTC, from disclosing the existence of the FTC's compulsory process, including the CID.

The FTC is engaged in the non-public investigation of a number of related entities and individuals (the "Investigation Subjects"). Evidence gathered to date indicates that the Investigation Subjects may be engaged in unlawful acts and practices in connection with their marketing and sale of credit repair services in violation of Section 5 of the FTC Act, 15 U.S.C. § 45; the Credit Repair Organizations Act, 15 U.S.C. §§ 1679-1679j; the FTC's Telemarketing Sales Rule, 16 C.F.R. Part 310; the FTC's Trade Regulation Rule on Impersonation of Government and Businesses, 16 C.F.R. Part 461; and Section 521 of the Gramm-Leach-Bliley Act, 15 U.S.C. § 6821.

Google's response to the CID is vital to the non-public investigation because the Investigation Subjects purchase ads from Google to manipulate search engine results to impersonate legitimate businesses. Google has informed the FTC that, absent a court order, it

RECEIVED
DEC 10 2025
Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

will inform the Investigation Subjects of the existence of the FTC's compulsory process. As more fully discussed in the attached Memorandum in Support of the FTC's Application and the supporting Declaration of FTC Investigator Michael Goldstein, disclosure to the Investigation Subjects is likely to cause an adverse result by seriously jeopardizing the non-public FTC investigation.

Accordingly, pursuant to Section 21A of the FTC Act, 15 U.S.C. § 57b-2a(c), the FTC respectfully seeks an order from this Court compelling Google to maintain the confidentiality of the FTC's compulsory process, including the CID, for an initial 60-day period, renewable for up to an additional seven 30-day periods. A proposed order is filed herewith.

Dated: December 10, 2025

Respectfully submitted,

*/s/ Gregory A. Ashe*
Gregory A. Ashe (DC Bar #451552)
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20850
Telephone: 202-326-3719
Email: gashe@ftc.gov

*Attorney for Applicant*
FEDERAL TRADE COMMISSION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| IN RE: FTC CIVIL INVESTIGATIVE DEMAND DIRECTED TO GOOGLE LLC | **UNDER SEAL PURSUANT TO 15 U.S.C. § 57b-2a(e)(2)**<br><br>Misc. No.________________ |
|---|---|

**DECLARATION OF FTC INVESTIGATOR MICHAEL GOLDSTEIN PURSUANT TO 28 U.S.C. § 1746**

Pursuant to 28 U.S.C. § 1746, I, Michael Goldstein declare that:

1. My name is Michael Goldstein. I am over the age of 21 and competent to give this declaration. I am an investigator with the Federal Trade Commission ("FTC"). My business address is Federal Trade Commission, 600 Pennsylvania Avenue, NW, CC-10232, Washington, DC 20580.

2. I have been an investigator with the FTC since April 2010. Since April 2012, I have been a Certified Fraud Examiner ("CFE"). The CFE certification is awarded by the Association of Certified Fraud Examiners. To become a CFE, I had to pass an exam which tested four subject areas: (1) fraud prevention and deterrence; (2) fraudulent financial transactions; (3) fraud investigations; and (4) legal elements of fraud.

3. My responsibilities include investigating parties suspected of engaging in unfair or deceptive acts or practices in violation of the Federal Trade Commission Act ("FTC Act") and any other laws or rules enforced by the FTC, including the Section 521 of the Gramm-Leach-Bliley Act, 15 U.S.C. § 6821; the Trade Regulation Rule on Impersonation of Government and Businesses, 16 CFR Part 461; and the Telemarketing Sales Rule, 16 C.F.R. Part 310.

4. I have been assigned to work on the FTC's investigation into a credit repair scam that includes, but is not limited to, the following subjects: Credit Glory LLC, Credit Glory Inc.,

Credit Sage LLC, Anubis LLC, Fair Credit LLC, Joy Credit Software LLC, Clerk Credit Systems LLC, Alexander Brola, Kevin Ford, Marko Petkovic, Liam Pavel Tame Te Amorangi Tira ("Liam Emery"), and Jiri Zajpt ("Investigation Subjects"). I am the custodian of documents and materials collected in the course of this investigation and have reviewed and analyzed all the evidence the FTC has heretofore obtained. The Investigation Subjects include companies and individuals that interface with consumers, others that are in league with those consumer-facing companies, and other persons and entities who appear to be harboring or helping to hide the ill-gotten gains of this scheme.

5. The FTC has not disclosed the existence of this investigation publicly and, to my knowledge, the Investigation Subjects are unaware of the investigation. The FTC intends to keep this investigation confidential at least until it may choose to bring an enforcement action against the Investigation Subjects. The FTC is not disclosing this investigation because, as described below, disclosure may jeopardize the investigation.

6. In the course of this non-public investigation, I have acquired personal knowledge and information about the facts stated herein, and, if called, would testify to the same. My conclusions are based on my investigation of the Investigation Subjects, including my review of documents obtained by the FTC, consumer complaints about the Investigation Subjects' business practices, and analysis of financial accounts maintained by the Investigation Subjects.

7. In addition, during my employment at the FTC, I have investigated dozens of fraud schemes, including many that were purporting to offer credit repair services. As a result, I am acquainted with tactics and techniques these types of operations commonly use to induce

consumers to enroll in credit repair services of dubious value, and some of my conclusions are based upon this knowledge.

**A. The Investigation Subjects' Business Practices**

8. The FTC has received hundreds of complaints about the Investigation Subjects' business practices through its call centers, online complaint portal, and partners such as the Better Business Bureau, as well as law enforcement and other government agencies across the nation.

9. I have reviewed the complaints, and I and other FTC staff have interviewed many of the complaining consumers. Additionally, the FTC has received several complaints from former employees of the Investigation Subjects that corroborate the consumer complaints. An FTC staff member has interviewed one of these former employees. The complaints by consumers and former employees tell a consistent narrative which detail the Investigation Subjects' scheme to deceive consumers into enrolling in their purported credit repair services by impersonating private institutions. I have also conducted internet research into websites, domain names, and internet advertisements[1] related to the Investigation Subjects. The following description is a summary of the foregoing evidence.

10. Consumers report that they initially come into contact with the Investigation Subjects after seeing negative information on their credit reports from a debt collector. The consumers then conduct an internet search (most often using Google.com) to look for the debt collector's phone number. Calling the phone number from the resultant search, the consumers connect with an agent of the Investigation Subjects.

---

[1] Google maintains a website called the Google Ads Transparency Center that allows the public to view advertisements connected to specific domain names of the advertisers. I viewed and copied the advertisements from two domain names, creditglory.com and creditsage.com. Both creditglory.com and creditsage.com have been linked to the Investigative Subjects by other evidence obtained by the FTC.

11. The evidence we have collected at present indicates that the negative debt collection information is real and was placed on consumers' reports by legitimate information furnishers.[2] However, the Investigation Subjects appear to have purchased hundreds of google ads that use the names of debt collection furnishers and boost them in the search results above the actual agencies. The result of this diverts consumers away from contacting the furnishers and legitimate owners of the debt and toward the Investigation Subjects.

12. Our investigation shows that the phone numbers associated with those advertisements that connect with agents of the Investigation Subjects are assigned to an account, or accounts, with Twilio, Inc., a telecommunications provider.

13. Many consumers state that when they talk to an agent of the Investigation Subjects, the agent does not inform them that they are not talking to the collection agency, even when asked. An FTC staff member spoke to a former employee ("FE-1") of the Investigation Subjects. FE-1 worked for the Investigation Subjects from January 2025 through the beginning of April 2025 and received initial inbound calls from consumers. FE-1 said that he was not allowed to disclose that he is not the collection agency, even if the consumer pushes.

14. FE-1 provided copies of scripts that he was given by the Investigative Subjects. Some of the statements the scripts instructed him to make were:

    a. you [the consumer] essentially have two options: The first option is to pay it [the debt about which the consumer believes they are calling], which might make sense…but it's a bad idea if you want to improve your credit score…The second option is disputing the collection on your credit report.

---

[2] Under the Fair Credit Reporting Act, a furnisher is an entity that provides information on a consumer for inclusion in a consumer report. A debt collection agency can be a furnisher if they are reporting consumer debts to the credit bureaus.

b. Our goal is to ensure that we REMOVE any inaccurate information that could be hurting your credit. Many of clients have a score INCREASE within just 90 days.

c. In over 80% of cases, there is something off with [the consumer's credit] report.

15. The evidence indicates that the Investigation Subjects make three different charges to the consumers accounts. The first charge is $1. The Investigation Subjects tell consumers that this fee is to unlock their credit report or validate the account the consumers are calling about.

16. The second charge varies considerably and appears to be based on the amount of the debt owed to the actual collector. Some consumers are told that the Investigation Subjects will get the negative information removed by disputing it with the credit bureaus for a fee which typically ranges between a few hundred to one thousand dollars. Other consumers are told that this amount is a settlement payoff for the debt. FE-1 stated that most consumers thought that the money they were paying to the Investigation Subjects was going toward the debt.

17. The third charge is a monthly recurring fee, which some consumers reported being $99 per month, and some reported being $24.99 per month. Agents for the Investigation Subjects tell consumers that they will have to pay this charge for a few months to until the negative information is removed.

18. Most consumer reported little or no change to their credit scores, while some reported that their credit scores went down. One consumer reported that she paid $799 for hard inquiry removal. She was promised that her credit score would go up 60 points but saw no change.

**B. The Investigation Subjects' Movement of Money**

19. During the course of the investigation, the FTC has obtained bank account data related to the Investigation Subjects' scheme. The Investigation Subjects hold sixteen depository and

credit card accounts at First Column, N.A. through Brex Treasury, LLC, a financial technology company ("Brex Accounts"). The Brex Accounts are in the names of Credit Glory LLC, Credit Sage LLC, Anubis LLC, and Fair Credit LLC.

20. Alex Brola is listed on the applications for all Brex Accounts as the founder and beneficial owner of all four companies. Liam Emery and Jiri Zajpt listed as account users on the Credit Glory LLC, Credit Sage LLC, and Fair Credit LLC accounts. An individual named Nen Petkovic is listed as an account user of the Credit Sage account. This is likely Marko Petkovic, whom internet research identifies as President and CEO of Credit Sage.

21. Per the documents provided by the bank, Alex Brola is a U.S. citizen and resident of Arizona; Liam Emery is a citizen and resident of New Zealand; and Jiri Zajpt is a citizen and resident of the Czech Republic. Internet research indicates that Petkovic is Serbian, but it is unclear whether he resides there. However, as stated below, a significant amount of funds are being transferred out of the Brex Accounts to a bank in Belgrade, Serbia.

22. The account documents and other documents collected during this investigation show that the Investigation Subjects have associated themselves with several different addresses across the U.S., many of which are virtual offices or mail forwarding services.

23. I have conducted an analysis of the Brex Accounts. The transaction data shows that the Investigation Subjects use one of the Credit Glory accounts and one of the Credit Sage accounts as settlement accounts, that is they receive consumer funds deposits from credit card transactions. I calculated that the Investigation Subjects have netted over $106 million from their scheme since October 2022. Alex Brola, has withdrawn over $31 million from the Brex Accounts,[3] and transferred them to a variety of accounts he personally holds. This

[3] The FTC has obtained additional financial data, particularly on wires, from the Federal Reserve and The Clearinghouse Payment Company indicating the existence of accounts at other banks,

includes brokerage, crypto, and depository accounts held in the U.S, as well as accounts held outside the U.S. in Switzerland and the Isle of Jersey.

24. The Investigation Subjects have transferred over $2.3 million out of the Brex Accounts to an account or accounts held by Liam Emery.

25. During the time period of February 2023 to April 2024, the Investigation Subjects transferred approximately $100,000 out of the Brex Accounts to a bank account in Belgrade, Serbia.

26. The Investigation Subjects have transferred approximately $4.3 million out of the Brex Accounts using a fund transfer platform called Payoneer. The Investigation Subjects hold accounts at Payoneer in the names of Credit Glory, Credit Sage, Clerk Credit Systems LLC, and Joy Credit Software LLC. Alex Brola and Kevin Ford are listed as the individuals associated with those accounts.

27. Most of the funds transferred via Payoneer are moving overseas, however I cannot determine the recipients from the data that the FTC has obtained thus far. The largest recipients by country of Payoneer transfers are Serbia (approximately $3.5 million), Jamaica (approximately $500,000), Columbia (approximately $230,000), Azerbaijan (approximately $210,000), Bosnia (approximately $117,000), and Montenegro (approximately $117,000).

**C. The Google CID**

28. FTC staff contacted Google and inquired whether they would keep a third-party CID from the FTC confidential or notify their customer of its existence. A representative from Google stated that they would notify their customer upon receiving the CID.

---

and possibly larger dissipation of consumer funds. However, our analysis which of those transactions are already accounted for in the Brex Accounts. Out of an abundance of caution, the presentation of my analysis here will just focus on the Brex Accounts.

29. The CID specifications demand information regarding the accounts associated with the Google Ads, relevant data regarding those ads and accounts, copies of all ads created by those accounts, and all other documents associated with the relevant accounts.

**D. FTC's Past Experience**

30. As illustrated by the following examples provided on information and belief, it has been the FTC's experience that FTC defendants who have engaged in deceptive schemes and who receive notice of the filing of an action by the FTC or of the FTC's intent to file an action alleging consumer deception, often attempt to undermine the FTC's efforts by dissipating or concealing assets:

a. In FTC v. BCO Consulting Services, Inc., Case No. 8:23-cv-0699-JWH (C.D. Cal. 2023), the FTC sought and obtained an ex parte temporary restraining order with a receivership and asset freeze. Upon learning of the order, one individual defendant went straight to the bank and withdrew $15,000 in cash from a corporate bank account. The defendant only returned the funds upon threat of possible enforcement action by the FTC.

b. In FTC v. Cardiff, Case No. 18-cv-2104-DMG-PLA (C.D. Cal. 2020), the FTC sought and obtained an ex parte temporary restraining order with a receivership and asset freeze over a business owned and controlled by an individual defendant who was already under an asset freeze and personal receivership. When he received actual notice of the temporary restraining order, but before he was served, the individual defendant rushed to his bank and withdrew $30,000 in cash and money orders from an account in the name of another company he wholly owns and controls.

c. In FTC and the State of Georgia v. Laptop and Desktop Repair, LLC, Case No. 1:16-CV-3591-AT (N.D. Ga. 2016), the FTC sought and obtained an ex parte TRO with an asset

freeze. After learning that the TRO had been granted, one defendant immediately withdrew money and transferred it to a non-defendant limited liability company. On the day that the court entered a preliminary injunction with an asset freeze, the same defendant withdrew $103,369 from his personal, online brokerage account and transferred the money to another personal acco

d. In FTC v. Goldman Schwartz Inc., Case No. 13-cv-00106 (S.D. Tex. 2013), the FTC obtained an ex parte TRO with an asset freeze against numerous corporate and individual defendants, including the companies' owner. Within an hour of being served with the TRO, but before the asset freeze had been fully implemented, the owner withdrew approximately $268,000 from a frozen corporate account. Shortly thereafter, the owner sold approximately $160,000 in securities held in a personal trading account. The next day, the owner's wife withdrew another $18,500 from a non-defendant corporation's account that was subject to the asset freeze. Because the court had issued its asset freeze in advance of these actions, the FTC and a court-appointed monitor were able to recover all of the mon

e. In FTC v. Lakhany, Case No. 12-337-CJC (C.D. Cal. 2012), the day after the court granted the TRO, but before the FTC could effect service, the defendant's employee notified the defendant of the FTC's lawsuit and receivership. The individual defendant proceeded to withdraw $204,000 from corporate bank accounts in violation of the asset freeze. The defendant later stipulated to contempt, and the majority of the funds were recov

f. In FTC v. E.M.A. Nationwide, Inc., Case No. 12-cv-2394 (N.D. Ohio 2012), the court denied the FTC's request for an ex parte temporary restraining order with an asset freeze

and required the FTC to serve the defendants before holding a preliminary injunction hearing. The FTC served the defendants on September 28, 2012, and by October 4, 2012 the individual defendants had withdrawn more than $152,000 from a corporate bank account, using the funds to retain attorneys in Canada and Miami, to prepay one individual defendant's apartment rent for three months, and to have cash on hand before stipulating to a preliminary injunction with an asset freeze.

g. In FTC v. Prime Legal Plans, Case No. 12-cv-61872 (S.D. Fla. 2012), upon hearing that the temporary restraining order had been granted, the defendants went straight to the bank and transferred $1.7 million in assets to one of the defendants' girlfriend and mother. The bank was able to claw most of it back, but the FTC, and thus consumers, ended up losing approximately $200,000.

h. In FTC v. Fereidoun "Fred" Khalilian, Case No. 1:10-cv-21788-MGC (S.D. Fla. 2010), the FTC sought and obtained an ex parte TRO with an asset freeze. Before the asset freeze could be processed by the banks, one of the defendant's employees withdrew large amounts of money from the company's bank accounts. The defendant eventually returned some, but not all, of the money. Additionally, the defendant attempted to remove assets located in his personal residence. The receiver, however, was monitoring the defendant's residence, and, after observing people taking a number of items from the defendant's residence at night, was able to halt the defendant's activities.

i. In FTC v. Data Medical Capital, Inc., Case No. 8:99-cv-01266-AHS-EE (C.D. Cal. 2009), the FTC moved for contempt and an ex parte TRO and asset freeze against certain defendants. One defendant learned of the FTC's contempt investigation and transferred approximately $1 million to a personal bank account before the FTC filed.

j. In FTC v. Latrese & Kevin Enterprises, Inc., et al., Case No. 3:08-01001-MMH-JRK (M.D. Fla. 2008), the FTC sought and obtained an ex parte TRO with an asset freeze in conjunction with a motion to show cause why the defendants should not be held in contempt. After being personally served with the TRO, one defendant withdrew $17,800 from a frozen bank account the same day. To avoid being held in contempt of the TRO, the defendant returned all but a few thousand dollars.

k. In FTC v. Connelly, Case No. 06-cv-701-DOC-RNB (C.D. Cal. 2006), upon learning of the FTC's action, three defendants withdrew at least $800,000 from their bank accounts, most of which was never recovered.

l. In FTC v. Global Mktg. Group, Inc., et al., Case No. 06 CV 2272 (M.D. Fla. 2006), the FTC obtained an ex parte TRO with an asset freeze and served the order on banks where the defendants were known or suspected to have accounts. After being served with the TRO, one defendant successfully withdrew over $500,000 from accounts previously unknown to the FTC. Most of these funds were wired to offshore bank accounts. The defendant was ultimately held in contempt and fled the country after failing to appear at a show cause hearing.

m. In FTC v. Universal Premium Servs., Inc., Case No. 2:06-cv-00849-GW-OP (C.D. Cal. 2006), a defendant and his wife withdrew over $45,000 from their joint personal bank account hours after learning of the FTC's action.

n. In FTC v. World Traders Ass'n, Case No. 05-cv-591-AHM-CT (C.D. Cal. 2005), upon learning of the temporary restraining order, the defendants appropriated $90,459 from their bank account, none of which was recovered.

o. In FTC v. American Entertainment Distribs., Inc., Case No. 1:04-cv-22431-JEM (S.D. Fla. 2004), the Court entered an asset freeze that froze assets of ten corporate and individual defendants. Within hours of receiving notice of the asset freeze, one of the individual defendants withdrew $39,500 from his bank. Because the asset freeze had been in place, the FTC was able to compel the individual defendant to return the money.

p. In FTC v. Nat'l Consumer Council, Case No. 04-cv-474 (C.D. Cal. 2004), the court granted the FTC's ex parte temporary restraining order with asset freeze and a temporary receiver against all but one of the corporate defendants. One of the individual defendants then deleted key electronic files on defendants' shared network server by accessing his account through a computer controlled by the corporate defendant not under receivership.

q. In FTC v. Unicyber Tech., Inc., et al., Case No. CV04-1569 LGB (C.D. Cal. 2004), the FTC obtained an ex parte TRO with asset freeze and appointment of a receiver. Shortly after the defendant was served with the TRO, he called his wife, who, at his direction, violated the asset freeze by transferring $405,000 of corporate funds to her father. With the assistance of the receiver, the FTC was able to recover these funds.

r. In FTC v. 4049705 Canada Inc., et al., Case No. 04 C 4694 (N.D. Ill. 2004), Canadian authorities executed a search warrant on the business premises of Canadian defendants. The FTC subsequently filed its complaint, and its motion for a temporary restraining order with asset freeze, and provided notice to the defendants. The FTC subsequently discovered only through its own investigation that the defendants had made several transfers totaling approximately $70,000 after receiving notice of the FTC's action but before the asset freeze was imposed. The FTC was unable to recover the $70,000. The

individual defendant was later held in contempt for transferring real estate in violation of the court-imposed asset freeze.

s. In FTC v. QT, Inc., et al., Case No. 03 C 3578 (N.D. Ill. 2003), the FTC obtained an ex parte TRO with asset freeze and when served with the TRO, the defendants immediately violated the order by withdrawing and transferring substantial sums of money from several bank accounts, totaling more than $2 million in one day.

t. In FTC v. Check Investors, Inc., Case No. 2:03-cv-02115-KSH-PS (D.N.J. 2003), the filed for an ex parte temporary restraining order with asset freeze. The Court required that the FTC give the defendants 24 hours' notice before holding a hearing on the FTC's motion. At the conclusion of the hearing, the Court granted the FTC's motion and ordered the defendants' assets frozen. Documents obtained during discovery showed that the defendants had purchased approximately $650,000 in gold coins, bullion, and certificates, of which only approximately $192,000 was found. Records showed that on May 19, 2013, the same day that the Court entered the TRO, the individual defendant's wife visited their safe deposit box. The remaining gold was never recovered.

u. In FTC v. Assail Inc., Case No. 6:03-cv-0007-WSS (W.D. Tex. 2003), the court issued an ex parte TRO, including an asset freeze. The lead defendant nonetheless transferred $200,000 within hours of being served with the TRO, which, after contempt proceedings and a lengthy appeal, the defendant was required to repay.

v. In FTC v. Bay Area Bus. Council, Inc., et al., Case No. 02 C 5762 (N.D. Ill. 2002), as soon as the Court entered a final order for more than $12 million, the defendants took advantage of the termination of a nearly two-year-old asset freeze and immediately

withdrew nearly all of their assets from their accounts before the FTC was able to obtain a turnover order.

w. In FTC v. The Tungsten Group, Case No. 2:01-CV-00773-RAJ (E.D. Va. 2001), the FTC obtained an ex parte TRO with an asset freeze. One defendant wired money out of a frozen account before the freeze could be imposed by the bank, but later returned it on advice of counsel. Another defendant tried to withdraw cash from a frozen account immediately after being served with the TRO, but he was blocked by the asset freeze.

x. In FTC v. SkyBiz.com, Inc., Case No. 4:01-cv-00396-CVE-FHM (N.D. Okla. 2001), within days of the service of the TRO with an asset freeze provision, one of the primary defendants convinced an overseas trustee to withdraw $1 million from the offshore account of a foreign affiliate. Because a domestic correspondent bank had been served with the TRO, it refused to transfer the funds. The money in the offshore account was preserved, and ultimately used to provide $20 million for consumer redress.

y. In FTC v. Consumer Repair Servs., Inc., Case No. 2:00-cv-11218-FMC-RZ (C.D. Cal. 2000), after defendants were notified of a TRO and asset freeze against them, they violated the order by withdrawing over $17,000 from accounts that were not yet frozen.

z. In FTC v. World Class Network, Inc., Case No. 9:97-00162-AHS-EE (C.D. Cal. 1997), two of the defendants withdrew from the bank, spent, and/or hid $202,000 in assets after learning of the action. Another defendant's spouse withdrew over $100,000 and left the state to open and to deposit funds into an out-of-state account.

aa. In FTC v. O'Day, Case No. 6:94-cv-01108-ACC (M.D. Fla. 1994), the court denied the request for an ex parte TRO with an asset freeze and scheduled a noticed hearing. Within hours of notice of the hearing, one individual defendant withdrew approximately

$200,000 from his bank account, thereby making it difficult for the FTC to preserve those funds for consumer redress.

bb. In FTC v. United Consumer Servs., Case No. 1:94-cv-3164-CAM (N.D. Ga. 1994), a defendant received advance notice of an FTC action and withdrew $100,000 after a TRO was entered against him. The money was only recovered after the FTC brought an action for contempt against that defendant.

cc. In FTC v. Am. Nat'l Cellular, Inc., Case No. CV 85-7375 WJR (C.D. Cal. 1985), a defendant learned of the action and immediately withdrew $1.2 million from his bank accounts. The defendant fled California and dissipated the money while living overseas.

31. Further, in the FTC's law enforcement experience, in numerous cases, defendants who learn of any FTC action have destroyed or disposed of business records, as illustrated by the following examples, provided on information and belief:

a. In FTC v. Panda Benefit Services, LLC, Case No. 8:24-cv-01386-CAS (C.D. Cal. 2024), the FTC obtained an ex parte TRO with asset freeze, appointment of receiver, and immediate access to business premises. During the execution of the immediate access, several of the defendants' employees who had been informed of the TRO stole three laptops from the business premises. Further, even though all of the individual defendants had been served, one of the defendants had his laptop wiped clean of data. Additionally, recordings of the defendants' sales calls that were maintained on a third-party server were deleted at the instruction of one of the individual defendants.

b. In FTC and the People of the State of New York v. Delaware Solutions LLC, Case No. 1:15-cv-00875-RJA (W.D.N.Y. 2015), the FTC sought a noticed TRO with asset freeze and immediate access to business premises. The court ordered that the defendants be

given two days notice of the motion and hearing. After being served but before the hearing, surveillance revealed that the defendants spend most of the night before the hearing removing evidence from one of their call centers, including a computer server and other equipment. After the TRO was granted, the FTC entered the call center and found it mostly empty.

c. In FTC v. Asia Pacific Telecom, Inc. et al., Case No. 10-cv-3168 (N.D. Ill. 2010), the FTC obtained an ex parte TRO freezing the defendants' assets and prohibiting them from destroying documents. After being served with the TRO, one of the individual defendants, Hans Smit, deleted an email account used to conduct many of the illegal practices at issue in the FTC's complaint. Smit took this step despite being served with a discovery request by the FTC for documents in the account and despite multiple demands from the court-appointed receiver for access to the account. The court ultimately held Smit in contempt for deleting the account in violation of the TRO.

d. In FTC v. Transcontinental Warranty, Inc., et al., Case No. 09 C 2927 (N.D. Ill. 2009), the FTC did not seek ex parte relief or to have the file sealed. Although the Court granted the FTC's motion for a TRO freezing all of the defendants' assets and appointing a receiver over the corporate defendant, merely one day after the case and motion were filed, the defendants and third parties had been given notice of the FTC's intent. When the receiver and counsel for the FTC arrived at the corporate defendant's premises pursuant to the Court order, hundreds of file folders with labels indicating that they contained records of the defendants' most recent transactions were found empty, five computers (including that of the corporate defendant's CFO) were allegedly stolen the night before the receiver and FTC arrived, and various third-party trade debtors of the

defendants froze payments due to the corporate defendant, which resulted in extensive litigation involving the receiver and ultimately cost the receivership estate hundreds of thousands of dollars.

e. In FTC v. Nat'l Consumer Counsel, Case No. 8:04-cv-00474-CJC-JWJ (C.D. Cal. 2004), the court granted the FTC's ex parte TRO with asset freeze and a temporary receiver against all but one of the corporate defendants. One of the individual defendants then deleted key electronic files on defendants' shared network server by accessing his account through a computer controlled by the corporate defendant not under receivership.

f. In FTC v. Physicians Healthcare Dev., Inc., Case No. 02-cv-2936 (C.D. Cal. 2002), upon receiving notice of the action, the defendants removed or shredded most of their records and documents, including all customer files.

g. In FTC v. Leisure Time Mktg., Inc. et al., Case No. 6:00-cv-01057-ACC (M.D. Fla. 2000), the court entered a TRO against the defendants with immediate access to the business premises. After an individual defendant was served and acknowledged his understanding that he was to preserve all assets and documents, that defendant ordered individuals to remove boxes of documents from one of the business premises. Fortunately, a police officer assisting the FTC in the immediate access saw this activity, and the FTC was able to contact the defendant's counsel and have the documents returned. That individual defendant also attempted to hide certain documents on the business premises in a room where FTC staff was informed that no business records were stored. Because the FTC had immediate access to the business premises, the FTC found these documents.

h. In FTC v. Osborne Precious Metals, Inc., Case No. 2:92-cv-04194-RMT (C.D. Cal. 1992), the defendants destroyed a number of business records shortly after learning of the action.

i. In FTC v. Academic Guidance Servs., Case No. 3:92-cv-03001-AET (D.N.J. 1992), the defendants discovered that the FTC intended to file a case against them and seek an ex parte temporary restraining order the following week. The FTC later learned that after this discovery, the defendants promptly leased a document shredder and spent the weekend destroying business records.

j. In FTC v. Applied Telemedia Eng'g & Mgmt., Inc., Case No. 1:91-cv-00635-UU (S.D. Fla. 1991), the FTC filed a noticed application for a TRO. When the FTC's agents arrived at defendants' offices to serve the pleadings, the agents observed the removal of documents from the premises. The FTC has no way of knowing whether any of these documents were ultimately produced.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on December 9th, 2025, in Washington, DC.

Michael B Goldstein

Michael Goldstein

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN RE: FTC CIVIL INVESTIGATIVE DEMAND ISSUED TO GOOGLE LLC | **UNDER SEAL PURSUANT TO 15 U.S.C. § 57b-2a(e)(2)**<br><br>Misc. No.________________ |

**MEMORANDUM IN SUPPORT OF THE FTC'S *EX PARTE* APPLICATION FOR AN ORDER PROHIBITING DISCLOSURE OF COMPULSORY PROCESS PURSUANT TO 15 U.S.C. § 57b-2a(c)**

The Federal Trade Commission ("FTC") seeks *ex parte* order, pursuant to Section 21A of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 57b-2a, temporarily prohibiting Google LLC, a third-party recipient of a FTC Civil Investigative Demand ("CID"), from disclosing the existence of the CID. The FTC currently is conducting a non-public investigation concerning a number of related entities (collectively the "Investigation Subjects") that may be engaged in an ongoing, unlawful credit repair services operation. Google will not produce records in response to the CID without notifying the Investigation Subjects. Notifying the Investigation Subjects about the CID would seriously jeopardize the FTC's ongoing investigation. The Court therefore should grant the FTC's *ex parte* application and issue an order temporarily prohibiting Google from disclosing the FTC's compulsory process, including the CID, for at least an initial period of 60 days, renewable upon application by the FTC. The requested non-disclosure order is nearly identical to orders previously sought by the FTC and entered by the court. *See, e.g.*, *In re FTC Civil Investigative Demand Issued to Dialpad, Inc.*, Case No. 1:25-mc-00039-RBW (D.D.C. May 1, 2025); *In re FTC Civil Investigative Demand Issued to PNC Bank, N.A.*, Case No. 1:25-mc-00039-RBW (D.D.C. Mar. 26, 2025); *In re FTC Civil Investigative Demand Directed to Squarespace, Inc.*, Case No. 1:24-mc-00110-JMC

(D.D.C. Sep. 17, 2024); *In re FTC Civil Investigative Demand Directed to JP Morgan Chase Bank, N.A.,* Case No. 1:24-mc-00062-EGS (D.D.C. May 17, 2024); *In re FTC Civil Investigative Demand Directed to Notarize, Inc*., Misc. No. 1:18-mc-00149-RDM (D.D.C. Oct. 22, 2018); *In re FTC Civil Investigative Demand Directed to PNC Bank, N.A.*, Misc. No. 1:18-mc-00087-DAR (D.D.C. Jul. 8, 2018); *In re FTC Civil Investigative Demand Directed to BMO Harris Bank, N.A.*, Case No. 1:15-cv-04162-EEC (N.D. Ill. May 12, 2015).

## I. BACKGROUND

### A. The FTC's Enforcement Authority

The FTC is an agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC is charged, *inter alia*, with enforcement of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Credit Repair Organizations Act ("CROA"), 15 U.S.C. §§ 1679-1679*l*, which prohibits untrue or misleading representations to induce the purchase of credit repair services, requires certain affirmative disclosures in the offering or sale of credit repair services, and prohibits credit repair service organizations from charging or receiving money or other valuable consideration for the performance of credit repair services before such services are fully performed. The FTC also enforces the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the Telemarketing Sale Rule ("TSR"), 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices in or affecting commerce. The FTC also enforces the Trade Regulation Rule on Impersonation of Government and Businesses ("Impersonation Rule"), 16 C.F.R. Part 461, which prohibits the impersonation of the government and businesses. The FTC also enforces Section 521 of the Gramm-Leach-

Bliley Act ("GLB Act"), 15 U.S.C. § 6821, which prohibits making false, fictitious, or fraudulent statements or representations to obtain or attempt to obtain from a consumer customer information of a financial institution.

If, upon investigation, the FTC has reason to believe that violations of the FTC Act, CROA, the TSR, the Impersonation Rule, or Section 521 of the GLB Act have occurred or are occurring, the FTC may initiate federal district court proceedings through its own attorneys to secure such relief as may be appropriate, including a preliminary and permanent injunction, monetary relief, and other relief, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, Section 410(b) of CROA, 15 U.S.C. § 1679h(b), Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and Section 522(a) of the GLB Act, 15 U.S.C. § 6822(a).

FTC investigations are not public and, as part of its investigatory powers, the FTC has the authority to issue CIDs (a type of administrative compulsory process) to compel the production of documentary materials, tangible things, or other information relevant to unfair or deceptive acts or practices in or affecting commerce. 15 U.S.C. § 57b-1.

**B. The FTC's Non-Public Investigation of the Investigation Subjects**

The FTC is engaged in a non-public investigation of the Investigation Subjects to determine whether, in connection with their marketing and sale of credit repair services, they are violating Section 5 of the FTC Act, CROA, the TSR, the Impersonation Rule, and/or Section 521 of the GLB Act.

The Investigation Subjects own and operate a credit repair scam that preys on consumers who owe debts by falsely impersonating real debt collection agencies. (PX01 at 3-4 ¶¶ 10-11.) The Investigation Subjects appear to be buying ads from Google so that the Investigation

Subjects' phone numbers display as top search results when consumers search for one of the collection agencies associated with their debts. (PX01 at 4 ¶ 11.) When consumers call the phone numbers (thinking they are calling the collection agency), the Investigation Subjects claim or strongly imply that they are, or work with, the collection agencies. (PX01 at 4 ¶ 13.) The representatives tell consumers that instead of paying the debt, the Investigation Subjects will delete the debt and corresponding negative information from consumers' credit reports and that, as a result, consumers' credit scores will increase significantly. (PX01 at 4-5 ¶ 14.) For example, scripts provided to the FTC by a former employee state

> you [the consumer] essentially have two options: The first option is to pay it [the debt about which the consumer believes they are calling], which might make sense…but it's a bad idea if you want to improve your credit score…The second option is disputing the collection on your credit report.

(PX01 at 4 ¶ 14.a.) The scripts then state "Our goal is to ensure that we REMOVE any inaccurate information that could be hurting your credit. Many of clients have a score INCREASE within just 90 days." (PX01 at 5 ¶ 14.b.) The scripts have the Investigation Subjects' telemarketers advise consumers "in over 80% of cases, there is something off with [the consumer's credit] report." (PX01 at 5 ¶ 14.c.) Needless to say, the Investigation Subjects are not affiliated with the debt collection companies they impersonate. And consumers report that the Investigation Subjects do not raise their credit scores. (PX01 at 5 ¶ 18.)

Documents provided by a former employee and statements from consumers show that the Investigation Subjects charge significant up-front fees before completing any of the purported credit repair work (PX01 at 5 ¶¶ 15-17 (fee ranges between an upfront fee of between several hundred to one thousand dollars and a monthly recurring fee between $24.99 and $99 per month), which would violate CROA's and the TSR's advance fee prohibitions.

**C. The Investigation Subjects Can Easily Move Assets beyond the Court's Jurisdiction**

The Investigation Subjects conduct their business in a manner that suggests they would transfer, hide, or dissipate assets if they learned about the FTC's non-public investigation. For example, evidence suggests that they use at least four different corporate names (and corresponding trade names) operating as a common enterprise. (PX01 at 1-2 ¶ 4.) An analysis of bank records obtained by the FTC indicates that from October 2022 to the present, the Investigation Subjects have netted over $106 million from their credit repair scheme. Further, the bank records show frequent transfers to accounts beyond the jurisdiction of federal courts—evidence shows that the Investigation Subjects have transferred million to overseas banks and entities located in Jamaica, Serbia, the Isle of Jersey, and various other countries. (PX01 at 7 ¶ 24 ($2.3 million to a principal who is a citizen of New Zealand), 7 ¶ 25 ($100,000 to a bank account in Belgrade, Serbia), 7 ¶ 27 ($3.5 million to unknown recipients in Serbia, $500,000 to unknown recipients in Jamaica, $230,000 to unknown recipients in Colombia, $210,000 to unknown recipients in Azerbaijan, $117,000 to unknown recipients in Bosnia, and $117,000 to unknown recipients in Montenegro).) And the principals controlling the Investigation Subjects also appear to be siphoning millions of dollars to their personal accounts, including cryptocurrency accounts. (PX01 at 6-7 ¶ 23 (over $31 million transferred to Alex Brola, the founder and beneficial owner of the Investigation Subjects), 7 ¶ 24 (over $2.3 million to another principal, Liam Emery, a citizen of New Zealand).) Finally, the Investigation Subjects conceal their physical location by using a number of commercial mail receiving agencies. (PX01 at 6 ¶ 22.) This demonstrates that the Investigation Subjects are able to move large amounts of money quickly and easily out of their businesses, and that there exists the risk that these funds may be dissipated, fraudulently transferred, concealed, or transferred to jurisdictions outside the reach of

federal courts if the Investigation Subjects become aware of this FTC investigation. (PX01 at 8-18 ¶¶ 30-31.) Ultimately, this would make it more difficult to recover restitution for injured consumers.

**D. The Google CID**

Among its other services, Google provides a service called Google Ads, an online advertising platform where businesses can create ads to appear on Google's properties, like search results, YouTube, and partner websites, based on a bidding system. Businesses use it to promote their products or services, increase website traffic, and raise awareness for their brand.

As discussed above, the Investigative Subjects use Google Ads to manipulate search engine results so that their phone numbers display as top search results when consumers search for one of the collection agencies associated with consumer's debts. Documents and information relating to the Investigation Subjects' placement of ads that appear on Google search engine results are vital to completing the FTC's investigation. Based on the FTC's prior dealings with Google in other investigations involving Google Ads, Google has informed the FTC that it cannot, absent a court order, produce records in response to a CID without notifying the Investigation Subjects. (PX01 at 7 ¶ 28.)

As discussed, the FTC's investigation to date provides ample reason to believe that disclosure of the CID to the Investigation Subjects likely will result in the dissipation, fraudulent transfer, or concealment of assets subject to recovery and could otherwise seriously jeopardize the non-public FTC investigation. Accordingly, the FTC files this motion seeking an order under Section 21A of the FTC Act, 15 U.S.C. § 57b-2a, prohibiting Google from disclosing the existence of the FTC's compulsory process for an initial period of 60 days.

## II. JURISDICTION AND VENUE

This Court has subject matter jurisdiction under 15 U.S.C. § 57b-2a(c), which authorizes the FTC to seek, and district courts to grant, an order temporarily prohibiting the disclosure of compulsory process issued by the FTC, and 28 U.S.C. §§ 1331 and 1345, because this application presents a question under a federal statute and a federal agency is the applicant. Venue is proper under 15 U.S.C. § 57b-2a(e)(1), which provides that a judicial action initiated by the FTC under 15 U.S.C. § 57b-2a may be brought in the United States District Court for the District of Columbia or any other appropriate United States District Court. Further, the statute authorizes the Court to issue a nondisclosure order for an initial period of 60 days, and the order may be extended for additional 30-day periods, upon application by the FTC, for a total of nine months. 15 U.S.C. § 57b-2a(c)(1).

## III. THIS COURT SHOULD ISSUE AN ORDER PROHIBITING DISCLOSURE OF THE FTC'S COMPULSORY PROCESS

Where disclosure of a CID may cause an "adverse result," Section 21A(c)(1) of the FTC Act expressly authorizes a Court to enter an *ex parte* order "prohibiting the recipient of compulsory process issued by the Commission from disclosing to any other person the existence of the process. . . ." 15 U.S.C. § 57b-2a(c)(1). The FTC Act enumerates five categories of "adverse results." *See* 15 U.S.C. § 57b-2a(g). The most applicable category here is that disclosure might "seriously jeopardiz[e] an investigation or proceeding related to fraudulent or deceptive commercial practices or persons involved in such practices." *Id.* This category includes, but is not limited to:

> . . . .
> (B) impeding the ability of the Commission to identify persons involved in fraudulent or deceptive commercial practices, or to trace the source or disposition of funds related to such practices; or

(C) the dissipation, fraudulent transfer, or concealment of assets subject to recovery by the Commission.

*Id.* Upon such a showing by the FTC, this Court has the authority to enter an order prohibiting the recipient of the FTC's CID from disclosing the existence of the CID for an initial period of up to 60 days. *See* 15 U.S.C. § 57b-2a(c)(1). Upon further application by the FTC, the Court may extend the order for up to seven additional 30-day periods, not to exceed a total of nine months. *See id.*

The Investigation Subjects' conduct, as detailed above and in the supporting declaration of FTC Investigator Michael Goldstein (PX01), provides reason to believe that disclosure of the CID by Google would jeopardize the FTC's non-public investigation. Specifically, the Investigation Subjects' efforts to transfer funds supports a finding that the Investigation Subjects would take steps to impede the ability of the FTC to trace funds related to the scam if they learned about the FTC's CID or would attempt to dissipate or conceal assets subject to recovery by the FTC. Indeed, the FTC's experience in analogous circumstances corroborates the belief that prior disclosure of the FTC's compulsory process may cause an adverse result. Accordingly, these considerations warrant orders pursuant to Section 21A of the FTC Act temporarily prohibiting Google from disclosing the existence of the FTC's compulsory process.

### A. Disclosure of the CID to the Investigation Subjects Will Impede the FTC's Ability to Trace Related Funds and Increase the Likelihood That the Investigation Subjects Will Dissipate, Fraudulently Transfer, or Conceal Assets Subject to Recovery

The Investigation Subjects' conduct provides reasons to believe that, if they learned about the CID, the Investigation Subjects would jeopardize the FTC's investigation by impeding the FTC's ability to trace funds and by dissipating, fraudulently transferring, or otherwise attempting to conceal assets subject to recovery. As discussed above, bank records demonstrate that the Investigation Subjects are able to move large amounts of money quickly and easily out

of their businesses, including to transferring funds to jurisdictions outside the reach of federal courts. Consequently, if the Investigation Subjects become aware of the FTC's non-public investigation, there is a high risk that the Investigation Subjects will accelerate their efforts to dissipate, fraudulently transfer, or conceal the funds, ultimately making it more difficult to recover restitution for injured consumers.

The FTC's experience in analogous cases further supports a finding that prior disclosure of the FTC's compulsory process to the Investigation Subjects may cause an adverse result. Many defendants engaged in similar deceptive or fraudulent activity who receive notice of the filing of an action by the FTC, or who learned of the FTC's intent to file such an action, have attempted to dissipate or conceal assets. (PX01 at 8-15 ¶ 30.) They have also attempted to destroy or dispose of evidence. (PX01 at 15-18 ¶ 31.) Thus, an order delaying notification is warranted so that this non-public investigation is not jeopardized by giving participants in a fraud the opportunity to destroy or tamper with evidence. *Cf. Application of United States for an Order of Nondisclosure Pursuant to 18 U.S.C. § 2705(b) for Grand Jury Subpoena #GJ2014031422765*, 41 F. Supp. 3d 1, 8 (D.D.C. 2014) (statutory requirement for delayed disclosure is satisfied under 18 U.S.C. § 2705(b) where government reports that Twitter's practice is to notify subscriber of existence of the subpoena and there is reason to believe that notifying the public of the existence of the subpoena will result in "destruction of or tampering with evidence" or "otherwise seriously jeopardizing an investigation"); *United States v. Scully*, 108 F. Supp. 3d 59, 85-87 (E.D.N.Y. 2015) (upholding nondisclosure under 18 U.S.C. §§ 2703(d) and 2705(b) because disclosure would impede ongoing investigation).

### B. The FTC's CID Is Not Subject to the Notification Requirements of ECPA

Section 21A(c) of the FTC Act, 15 U.S.C. § 57b-2a(c), allows the sought-after relief only if notification is not required by Chapter 121 of Title 18.[1] The FTC's CID to Google does not seek information that triggers the notification requirements of ECPA. Consequently, because ECPA does not require any type of notification, the FTC's application for, and the Court's issuance of, the proposed order temporarily prohibiting Google from disclosing the existence of the FTC's compulsory process is wholly warranted.

ECPA prohibits a provider of electronic communications or remote computing services from knowingly divulging to any governmental entity a record or other information pertaining to a customer of such service without a warrant, court order, or the consent of the customer. *See* 18 U.S.C. §§ 2702(3), 2703(c). But Google does not provide its advertising account holders either remote computing services or electronic communications services, as defined by ECPA,[2] and the CID seeks only documents and information relating to Google's Google Ads services. (PX01 at 8 ¶ 29.) Accordingly, ECPA does not require any type of notification.[3]

## IV. CONCLUSION

The Investigation Subjects' ability to quickly and easily dissipate or conceal assets, as well as the FTC's experience in analogous cases, provide more than sufficient "reason to believe

[1] Most of Chapter 121 of Title 18 is the codification of the Electronic Communications Privacy Act ("ECPA"), Pub. L. 99-508, 100 Stat. 1848.

[2] Electronic communications are transfers of signs, signals, writing, images, sounds, data or intelligence transmitted over a wire, radio, or other electronic system—excluding electronic funds transfer information stored by a financial institution. 18 U.S.C. § 2510(12). An electronic communications service is any service that allows users the ability to send or receive wires or electronic communications. 18 U.S.C. § 2510(15). A remote computing service is "the provision to the public of computer storage or processing services by means of an electronic system." 18 U.S.C. § 2711(2).

[3] Merely as a precaution, the CID includes a disclaimer instructing Google not to turn over records or information prohibited from disclosure. (PX01 at XX.)

that disclosure may cause an adverse result" if the Investigation Subjects become aware of the FTC's investigation. 15 U.S.C. § 57b-2a(g). In particular, there is reason to believe that disclosure might "seriously jeopardize[e]" the FTC's investigation by "impeding the ability of the Commission to . . . trace the source or disposition of funds related to such practices" and causing "the dissipation, fraudulent transfer, or concealment of assets subject to recovery by the Commission." *Id.* Accordingly, the FTC urges this Court to enter an order pursuant to Section 21A of the FTC Act temporarily prohibiting Google from disclosing the existence of the FTC's process, including the CID, for an initial period of 60 days and permitting the FTC to seek renewal of the order for up to an additional seven 30-day periods.

Dated: December 10, 2025

Respectfully submitted,

*/s/ Gregory A. Ashe*

Gregory A. Ashe (DC Bar #451552)
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20850
Telephone: 202-326-3719
Email: gashe@ftc.gov

*Attorney for Applicant*
FEDERAL TRADE COMMISSION